IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TEXAS SALES AND MARKETING, INC., } | |
| and CHARLES J. BECK, SR., Individually, } | |
| } | |
| Plaintiffs } | |
| } | |
| v. } | CIVIL ACTION NO. H-05-3555 |
| } | |
| DISTINCTIVE APPLIANCES, INC., } | |
| DACOR, INC., and } | |
| MIKE JOSEPH, Individually. } | |
| } | |
| Defendants } | |

## **MEMORANDUM OPINION & ORDER**

Pending before the court are (1) Plaintiffs Texas Sales and Marketing, Inc. ("TSM") and Charles J. Beck, Sr. ("Beck") (collectively "Plaintiffs'") motion for leave to amend their original complaint (Doc. 46); and (2) Defendants Distinctive Appliances, Inc., d/b/a Dacor, incorrectly served as Dacor Inc., ("DAI") and Mike Joseph ("Joseph") (collectively "Defendants'") motion for summary judgment (Doc. 47). For the reasons articulated below, the court ORDERS that Plaintiffs' motion to amend their complaint (Doc. 46) is DENIED, and the court further ORDERS that Defendants' motion for summary judgment (Doc. 47) is GRANTED.

**I.     Background and Relevant Facts**

TSM, owned and operated by the Beck family, is an independent distributor of home goods, appliances, and remodeling products. DAI manufacturers high-end appliances and supplied approximately 80% of TSM's business. The two entities had worked amicably together for years. In 1998, TSM and DAI entered into a Distribution Agreement ("Agreement"), giving TSM the right to market and sell DAI products in South Texas. Agreement (Doc. 47, Ex. 1). The Agreement "remain[ed] in full force and effect" until terminated by either party, *"with or without cause*, by

giving not less than thirty (30) days *notice in writing* to the other party." *Id*. at ¶ 6.1 (emphasis added).  Moreover, the Agreement could "not be altered or amended *except in writing* signed by both parties. *Id*. at ¶ 8.1 (emphasis added).

By late August of 2001, DAI had decided to terminate the Agreement.  Instead of mailing the customary letter of termination, it sent two top-level executives, Dave Wick ("Wick") and Duncan Black ("Black"), to deliver the bad news.  Wick and Black met with Beck on August 30, 2001 to discuss the situation and the imminent termination.  Beck claims Wick and Black orally represented that the Agreement was "cancelled," and Beck had no doubt in his mind that the Agreement was terminated.  *See* Affidavit of Charles J. Beck ("Beck Aff.") at 4 (Doc. 58, Appendix Ex. II).  The two DAI executives did not, however, give Beck anything in writing at this meeting.  *See* Deposition of Beck ("Beck Dep.") at 115:6-10 (Doc. 47, Ex. 2(d)).

The following day, DAI's president, Joseph, called Beck to discuss the relationship between TSM and DAI.  Praising TSM's loyalty, Joseph indicated that DAI had changed its mind about the forthcoming termination and wanted to keep TSM on as an independent distributor.  According to Beck, Joseph also promised "security that [TSM and the Beck family] had not felt in years" and that TSM would be treated as a "factory branch."  Beck Aff. at 5 (Doc. 58, Appendix Ex. II).[1]  Joseph did not mention the 1998 Agreement explicitly, but he suggested that the relationship between DAI and TSM would not materially change.[2]  Wick followed up Joseph's call the same day and also mentioned the possibility of TSM functioning "like a factory branch."[3]  Like

---

[1] In his affidavit, Beck also claims that Joseph promised TSM a "builder program" to aid TSM's profitability.  *See* Beck Aff. at 6 (Doc. 58, Appendix Ex. II).  Nevertheless, a full review of the transcript of the Joseph-Beck conversation (provided by Plaintiffs and objected to by Defendants) does not support this claim.  *See* Joseph-Beck Conversation ("Joseph-Beck Conv.") (Doc. 58, Appendix Ex. II, Ex. B). Defendants object to the admissibility of all the telephone transcripts (Exhibits A, B, and C) because, as attached to Appendix Ex. I, the transcripts have not been properly authenticated pursuant to Fed. R Evid. 901.  Nevertheless, the transcripts are also attached to Appendix Ex. II (Beck's affidavit), and Defendants do not object to Beck's ability to authenticate the transcripts.  Therefore, Defendants' objection is OVERRULED.

[2] *See, e.g..*, *id*. at 2:19-20, 8:4-8, and 10:14-19.

[3] *See* Wick-Beck Conversation ("Wick-Beck Conv.") at 2:18-20 and 3:14-17 (Doc. 58, Appendix Ex. II, Ex. C).

Joseph, Wick did not bring up the 1998 Agreement. Neither the Joseph nor the Wick conversation was memorialized in writing. After the close brush with termination, TSM continued as an independent distributor with DAI for an additional two years. In 2003, DAI sent an official letter terminating the relationship pursuant to the 1998 Agreement.

Plaintiffs brought suit against DAI and Joseph, individually, alleging (1) unfair business practices, restraint of trade, and violations of Section 15.05 (c) of the Texas Business and Commerce Code; (2) tortious interference with prospective business relationships; (3) breach of contract; (4) breach of a duty of good faith and fair dealing; (5) fraud; (6) negligent misrepresentation, and (7) violations of the Deceptive Trade Practices Act ("DTPA"), TEX. BUS. & COM. CODE § 17.50 *et seq.* Defendants have moved for summary judgment on all of Plaintiffs' claims.

Shortly before Defendants moved for summary judgment, Plaintiffs filed a motion to amend their original complaint. The proposed amended complaint seeks to "clarify" the parties and issues by (1) including Texas Sales and Marketing II, L.L.P. ("TSM II"), the limited partnership in which TSM is a general partner, as a plaintiff; and by (2) dismissing their anti-trust and tortious interference claims. *See* Motion for Leave to Amend Plaintiffs' Complaint (Doc. 46). Defendants do not object to the dismissal of the claims, but they do strenuously object to the addition of TSM II as a "new" party. *See* Defendants' Response to Motion to Amend (Doc. 53). Before resolving the motion for summary judgment, the court turns first to the pending motion to amend.

## II.     Plaintiffs' Motion to Amend

Plaintiffs filed their motion for leave to amend their original complaint on December 1, 2006, despite the fact that the deadline for filing motions for leave to amend pleadings expired May 2, 2006. *See* Scheduling Order at ¶ 1 (Doc. 22). When a scheduling order deadline has been issued by the district court and has expired, Federal Rule of Civil Procedure 16(b) governs the amendment of the pleadings. *S & W Enterprises, L.L.C. v. Southtrust Bank of Ala., NA,* 315 F.3d

533, 535-36 (5th Cir.2003). Under Rule 16(b), a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge." FED. R. CIV. P. 16(b). To establish "good cause," a party needing an extension must demonstrate to the court that the deadlines cannot reasonably be met despite the party's due diligence. *S & W Enterprises*, 315 F.3d at 535 (citing 6A Charles Alan Wright, Federal Practice and Procedure § 1522.1 (2d ed.1990)). Only once the moving party demonstrates good cause to modify the scheduling order deadline may a court address whether amendment is proper under the more liberal standards of Federal Rule of Civil Procedure 15(a). *Id.* at 536.[4]

Four factors are weighed to determine whether to grant or deny untimely motions for leave to amend: (1) the explanation for the failure to timely move for leave to amend, (2) the importance of the amendment, (3) potential prejudice in allowing the amendment, and (4) the availability of a continuance to cure such prejudice. *S & W Enterprises*, 315 F.3d at 536. In this case, at least three of the four factors weigh against allowing Plaintiffs to amend. Plaintiffs have not provided any explanation for their delay in identifying TSM II as a potential party in interest. Plaintiffs' allegation that "this is not truly a situation of 'undue delay' . . . but one of recently discovered information" is unpersuasive. There is no elaboration on why this information was recently discovered, especially considering that TSM and TSM II are closely-held business entities. There is no suggestion or argument that this relationship was newly formed or came into existence after the lawsuit was filed. Plaintiffs have essentially provided no explanation for the delay. Moreover, Defendants would be substantially prejudiced in trying to prepare a defense for the new plaintiff with a trial term beginning the week of February 20, 2007. Finally, a continuance to allow Defendant the opportunity to take this additional discovery will unduly delay trial, especially in light

---

[4] Rule 15(a) instructs that "leave [to amend] shall be freely given when justice so requires." FED. R. CIV. P. 15(a).

of Plaintiffs' failure to adequately explain the delay. Plaintiffs have not demonstrated good cause, and their motion for leave to amend is denied.

**III.    Defendants' Motion for Summary Judgment**

    A.    <u>Legal Standard on Summary Judgment</u>

A party moving for summary judgment must inform the court of the motion's basis and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the movant makes this showing, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *citing U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248. The non-movant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994);

*Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Texas Tech University*, 80 F.3d 1042, 1046 (5th Cir. 1996), *citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587-88. In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). A party cannot, however, manufacture a fact issue by simply contradicting previous sworn testimony without explanation. *Cleveland v . Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (citing, *inter alia*, *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984)).

B.  <u>Analysis</u>

Plaintiffs' claims for relief hinge on two critical issues: (1) whether DAI's oral representations in 2001 terminated the 1998 Agreement, and with it, the termination-at-will provision, and (2) whether the oral representations created a "new agreement" without a termination-at-will provision. Addressing each issue in turn, the court finds that the 1998 Agreement governed

the DAI/TSM relationship at all times, and no "new agreement" was formed. DAI terminated the relationship properly under the Agreement, and all of Plaintiff's claims for relief must fail as a matter of law.

      1.    Whether DAI's oral representations in 2001 terminated the 1998 Agreement.

Plaintiffs' basic contention that Defendants orally terminated the 1998 Agreement is without merit because the Agreement expressly provided that termination was only effective through a writing. When the terms of a contract are unambiguous, the construction of the contract is a matter of law for the courts. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006) (citing *MCI Telecomms. Corp. v. Tex. Utils Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1990)).[5] A court, for purposes of interpretation, must ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).[6] To flesh out this true intent, the court examines "the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *MCI Telecomms.*, 995 S.W.2d at 65.[7]

Here, the terms of the contract are not ambiguous. Section 6.1 states, without qualification, that termination must be made "in writing." Agreement (Doc. 47, Ex. 1). Indeed, the very same provision continues:

> *The right of termination contained herein is absolute*
> and neither party shall incur any liability by reason
> thereof, each party releasing the other from any

---

[5] *See also Parsons v. Bristol Dev. Co.*, 402 P.2d 839, 842 (Cal. 1965) ("It is solely a judicial function to interpret a written instrument unless the interpretation turns on the credibility of extrinsic evidence."). The Agreement stipulates if "any of its provisions become a subject of dispute, the law of the State of California shall govern." Agreement at ¶ 8.4 (Doc. 47, Ex. 1). However, the parties briefed the court only with respect to Texas law, and neither raised the choice of law provision as an issue. Nevertheless, the laws of Texas and California do not materially differ on basic principles of contract interpretation. Therefore, the court will provide a parallel citation to California law when applicable.

[6] *See also* Cal. Civ. Code § 1636 (Deering 2006) ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.").

[7] *See also Ratcliff Architects v. Vanir Constr. Mgmt.*, 88 Cal. App. 4th 595, 602 (2001) ("Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless.").

> claims resulting from, or arising out of such termination; provided, however, that nothing in this section shall be construed as a release of any payment obligation arising prior to termination.

*Id.* (emphasis added).   Beck understood and acknowledged that the Agreement could only be terminated in writing.  *See* Beck Dep. at 96:10 - 98:22 (Doc. 59, Ex. D).  Moreover, he admits DAI never sent a letter, or any other *writing*, terminating the agreement:

> Q. (Defense Counsel): . . . You never – and I mean TSM – never ever got a letter in writing terminating this 1998 distributor agreement until September of 2003.  Isn't that true?
>
> A. (Beck):  In writing, yes.

Beck Dep.  at 115:6-10 (Doc.  47, Ex.  2(d)).  Reluctantly, Beck also concedes that the oral representations made by Joseph did not and could not terminate the Agreement:

> Q. (Defense Counsel): And when you hung up the phone with [Joseph], you knew very well that [the 1998 Agreement] had not been cancelled; correct?
>
> A. (Beck): That's a very difficult question. I mean –
>
> Q. (Defense Counsel): It's actually fairly simple.
>
> A. (Beck): – technically it wasn't cancelled *because of the writing*.  But orally from [Joseph] I had no doubt in my mind that that distributor thing was cancelled . . .

Beck Dep. at 309:10-22 (Doc. 59, Ex. D) (emphasis added).  Oral representations made to Beck would have no legal effect on the continued viability of the Agreement.  For the court to hold the Agreement was orally terminated in 2001, it would have to essentially remove Section 6.1 from the Agreement, which impermissibly frustrates the intent of the parties and renders a primary term of the Agreement meaningless.  Therefore, as a matter of law, TSM and DAI remained bound by the terms of the Agreement.

Nevertheless, Plaintiffs have invoked numerous formulations of the equitable estoppel doctrine to argue that Defendants should be prevented from relying on the 1998 Agreement.[8]  Under general equitable estoppel principles, a party may be estopped from relying on a legal right where the party, through his own fault, has induced another to change his position for the worse.  *See Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex. App.–Texarkana 1992, writ denied) (citing *The Praetorians v. Strickland*, 66 S.W.2d 686, 688-89 (Tex. Comm'n App. 1933, judgm't approved).  A sub-set of equitable estoppel is "quasi estoppel," which "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him."  *Id*.  Neither pure equitable estoppel nor quasi estoppel apply in this case.  In terms of pure equitable estoppel, Plaintiffs have not provided any evidence of detrimental reliance.  TSM, at the time the Agreement was signed, agreed with the terms governing termination, including the provisions of Section 6.1.  TSM knew about the terms of the 1998 Agreement and cannot have reasonably relied on any oral representations made by DAI regarding termination.  Moreover, TSM benefitted from the distributorship agreement both in 1998 and for the additional two-year reprieve after 2001.  Therefore, there is no evidence that Plaintiffs were induced to change their position for the worse.  In addition, quasi estoppel does not apply because Plaintiffs offer no evidence that Defendants have asserted a right inconsistent with a position previously taken by them.  DAI has consistently maintained that the 1998 Agreement governed the relationship of DAI and TSM at all relevant times.  Principles of equity, therefore, do not prevent the court from effectuating the parties' clear and voluntary assent to termination only through a writing, as manifested in Section 6.1 of the Agreement.  As such the 1998 Agreement was not orally terminated in 2001 and continued to govern the legal relationship between DAI and TSM.

> 2. Whether DAI's oral representations in 2001 constituted a "new agreement" between the parties.

---

[8] The court addresses Plaintiffs' theories of promissory estoppel in Part 2 *infra*.

Plaintiffs second contention is that Joseph made certain oral promises to lure TSM into a "new agreement" with DAI. *See* Beck Aff. at 5-6 (Doc. 58, Appendix Ex. II). The court disagrees. Plaintiffs have provided no evidence that a valid contract, other than the 1998 Agreement, existed between DAI and TSM. A valid contract requires (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the understanding that it be mutually binding. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.–Houston [1st Dist.] 2005, pet. denied); *accord Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App–San Antonio 1999, pet. denied). The terms of a contract must be sufficiently definite and agreed upon to be legally binding. *See Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966) ("A court cannot enforce a contract unless it can determine what it is."). Where an essential term is open for future negotiations, there is no binding contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (citing *Gerdes v. Mustang Exploration Co.*, 666 S.W.2d 640, 644 (Tex. App.–Corpus Christi 1984, no writ)).

Here, there is no evidence as to either the certainty of the terms or the meeting of the minds necessary for the court to hold that a valid contract existed. Plaintiffs allege that the "new agreement" included terms of "financial security" and treatment of TSM as a "factory branch." Beck testified, however that he never discussed specific terms of the new agreement with Joseph. Beck Dep. at 165:2-12 (Doc. 59, Ex. D). Beck further testified that the essential terms of the new agreement were left open for future negotiations. *Id.* at 173:3-9. Yet in his affidavit, Beck claims that "financial security" meant "the removal of the no fault, thirty day kiss of death clause." Beck Aff. at 6 (Doc. 58, Appendix Ex. II.). This claim is directly contradicted by his prior sworn testimony without any explanation for the discrepancy. When an affidavit is impeached by prior sworn testimony without sufficient explanation, the court must view that affidavit with profound skepticism. *See Herrera v. CTS Corp.*, 183 F. Supp. 2d 921, 928 (S.D. Tex. 2002). Indeed, it is

within the court's discretion to disregard the affidavit altogether should the court determine that it is dealing with a "sham affidavit." *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (noting that the utility of summary judgment would be greatly diminished if courts were unable to screen out "sham issues of fact").[9] To the extent that Beck's affidavit attempts to manufacture a fact issue, the affidavit is disregarded. Therefore, Plaintiffs have not directed the court to the specific terms of the agreement they now want enforced. Nor have they produced evidence that a "meeting of the minds" occurred during Beck's conversation with Joseph and Wick. It is undisputed that none of the parties discussed the 1998 Agreement. Moreover, Joseph and Wick repeatedly mentioned that the relationship would remain unchanged. It is not reasonable for Beck to assume that a reference to "financial security" meant that Section 6.1 no longer applied, especially considering the 1998 Agreement requirements regarding a writing for termination and modification. As such, there is no evidence of the manifestation of mutual assent necessary for finding a valid contract. Without specific terms or the manifestation of mutual assent, TSM and DAI did not enter into a "new agreement" in 2001.

The Plaintiffs' reliance on the doctrine of promissory estoppel is misplaced. Promissory estoppel requires (1) a promise; (2) the foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). Plaintiffs fail to provide proof of all three elements. First, vague and amorphous references to "financial stability" and "factory branches" do not constitute definite promises. Second, assuming Joseph's statements did constitute promises, DAI could not have foreseen any reliance by TSM when the 1998 Agreement clearly required a writing for either termination or modification of the distributorship agreement. Third, Plaintiffs have not shown detrimental reliance despite the affidavit testimony to the contrary of John Jackson ("Jackson"), an

---

[9] A court may consider, however, an affidavit supplementing or clarifying, rather than contradicting, prior sworn testimony when evaluating genuine issues in a motion for summary judgment. *S.W.S Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).

experienced participant in the high-end appliance industry and close confidant of Beck. *See* Affidavit of John Jackson ("Jackson Aff.") (Doc. 58, Appendix Ex. I).[10] Joseph testifies to his ability to "de-code" and interpret the "sub-language" of the oral discussions between DAI and TSM in 2001. *Id.* at 4-5. He ultimately concludes that a reasonable distributor in Beck's position would have relied on the oral statements made by DAI representatives. *See id.* at 7, 12-14, and 17-18. However, Jackson's testimony is predicated on the verbal "cancellation"[11] of the 1998 Agreement, which did not occur. In addition, his conclusion regarding Beck's "reasonable reliance" is undercut by Beck's knowledge that the Agreement continued to operate in the absence of a writing. Finally, Jackson's interpretations of Beck's "detriment" is unreasonable. TSM continued to do business with DAI for an additional two years, and benefitted accordingly. Therefore, Plaintiffs have not demonstrated, either at law or in equity, that a new or modified agreement between DAI and TSM arose during the oral conversations in 2001.

  Having found that the 1998 Agreement operated to legally bind the parties until properly terminated in September 2003 and that the parties did not enter into a "new agreement" in 2001, the court finds the rest of Plaintiffs' claims for relief do not survive summary judgment. The remaining claims are addressed in turn.

   3. Plaintiffs' anti-trust and tortious interference claims.[12]

---

[10] In a prior court order, Jackson was disqualified as an expert on the termination and formation of contracts even in the high-end appliance industry. *See* Memorandum and Order at 5 (Doc.60).

[11] Jackson references the 1998 Agreement's cancellation repeatedly throughout his affidavit. *See id.* at 2, 5-7, 12-14, 17-18, and 20.

[12] The court notes that Plaintiffs' proposed amended complaint dispenses with the anti-trust and tortious interference claims. Plaintiffs assumed that their leave to amend would be granted, so they did not address these two claims in their response to summary judgment. *See* Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Plaintiffs' Response") at F.N. 1 (Doc. 58). Having denied leave to amend, the court will examine the two claims under the applicable summary judgment standards.

Plaintiffs' original complaint alleges that Defendants violated the Texas Anti-Trust Act. *See* Plaintiffs Original Complaint (Doc. 47, Ex. 3). The Texas Anti-trust Act states in relevant part:

> It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods . . . on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce.

TEX. BUS. & COM. CODE ANN. § 15.05(c). Plaintiffs have produced no evidence that Defendants' actions constituted an unlawful restraint of trade. As such, Defendants are entitled to summary judgment on Plaintiffs' anti-trust claim.

Plaintiffs also bring a claim for tortious interference with prospective business relationships. *See* Plaintiffs Original Complaint (Doc. 47, Ex. 3). To establish this cause of action, a plaintiff must show (1) a reasonable probability that it would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.–Houston [14th Dist.] 2001, pet. denied); *see also Decorative Ctr. of Houston v. Direct Response Publishers, Inc.*, 264 F. Supp. 2d 535, 556 (S.D. Tex. 2003) (applying Texas law). Plaintiffs have not provided any evidence that Defendants interfered with a prospective relationship. Nor have they provided evidence that TSM or Beck would have entered into a relationship with another supplier but for the actions of Defendants. No genuine issues of material fact remain regarding this claim, and Defendants are entitled to judgment as a matter of law.

        4.        Plaintiffs' breach of contract and breach of good faith and fair dealing claims

Plaintiffs' claim that Defendants breached the "new agreement" by terminating the relationship in 2003 without cause. As discussed above, a "new agreement" was never formed between the parties. Defendants could not breach an agreement that did not exist. Plaintiffs' claim, therefore, fails as a matter of law.

Plaintiffs also argue that the conduct of DAI and Joseph constitutes a breach of the duty of good faith and fair dealing. Texas law recognizes that a duty of good faith and fair dealing does not exist in every contract. *Id.* at 522. Nevertheless, certain exceptions exist for "special relationships," such as those between insurers and insureds, principal and agent, joint venturers, and partners. *See id.* at 522, 524 (Spears, J., concurring); *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 212-13 (Tex. 1988). The relationship between supplier and distributor does not typically find itself classified as "special." *See Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 481 (Tex. App.–Corpus Christi 1989, writ denied) ("The "special relationship" cause of action in tort for breach of the duty of good faith and fair dealing, however, does not extend to ordinary commercial contractual relationships such as the supplier-distributor relationship."); *see also ARA Auto. Group v. Central Garage*, 124 F.3d 720, 723 (5th Cir. 1997) ("Under Texas law, a supplier/distributor relationship is not the type of formal relationship that automatically gives rise to a fiduciary duty."). However, Plaintiffs allege additional facts that may give rise to an *informal* fiduciary relationship, or "confidential relationship." *See Crim. Truck & Tractor Co. v. Navistar Int'l. Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992). Although the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law. *Id.* (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).

In his affidavit, Beck repeatedly references the close, personal relationship he felt with Joseph and DAI. He speaks of the first TSM-DAI contract being written on a piece of napkin. Beck Aff. at 1 (Doc. 58, Appendix Ex. II). He remembers being referred to as "members of the

[DAI] family." *Id.* He points to a shared religious faith between himself and Joseph. *Id.* at 2. Beck claims to have felt a deep trust and confidence not only in DAI but in Joseph personally. *See id.* at 4-7. Nevertheless, the evidence of trust, friendship, and reliance cited by Plaintiffs does not ultimately give rise to a fiduciary duty because it is not evidence of a relationship requiring DAI to put TSM's interest before its own. *See ARA Auto. Group*, 124 F.3d at 726-27; *Crim Truck*, 823 S.W.2d at 594-95. A cordial, long-term business relationship does not create a fiduciary relationship. *Crim Truck*, 823 S.W.2d at 594-95 (holding that a 42-year relationship was insufficient to create a fiduciary duty). Nor is close friendship adequate. *See Thigpen*, 363 S.W.2d at 253. Like the parties in *Crim Truck*, TSM and DAI remained free to pursue their own interests. DAI did not owe a fiduciary duty to TSM and, therefore, did not owe a duty of good faith and fair dealing. Plaintiffs' claim for breach of that duty must fail as a matter of law.

        5.        Plaintiffs' misrepresentation claims

Plaintiffs' final claims include fraud, both actual and constructive, negligent misrepresentation, and violations of the DTPA. As explained below, none raise a genuine issue of material fact, and Defendants are entitled to summary judgment on all four claims.

A fraud cause of action arises from a material misrepresentation which was false when it was made, or was asserted without the knowledge of its truth, the speaker knew it was false or made it recklessly without any knowledge of its truth, which was acted upon, which was relied upon, and which caused injury. *Formosa Plastics v. Presidio Engineers*, 960 S.W.2d 41, 48 (Tex. 1998). A promise to do an act in the future is actionable fraud only when made with the intention, design and purpose of deceiving, and with no intention of performing the act. *Airborne Freight Corp. v. C.R. Lee Enterprises, Inc.*, 847 S.W.2d 289, 294 (Tex.App.--El Paso 1992, writ denied). Plaintiffs must show that the promise was false at the time it was made. *Schindler v. Austwell Farmers Cooperative*, 841 S.W.2d 853 (Tex. 1992). As in *Airborne*, the 1998 Agreement vitiates any reliance the distributor may have placed in "sweeping, off-hand statements" made by the other

party as a matter of law. *Airborne*, 847 S.W.2d at 297. The 30-day termination provision in the Agreement clearly gives notice that any oral promises to the contrary would not control. *See also San Antonio Garment Finishers v. Levi Strauss & Co.*, 18 F. Supp. 669, 674 (W.D. Tex 1998) (holding under similar facts that a contractor should have obtained promises in writing if it believed the statements to change the obligations of the parties under their agreement). Therefore, the fraud claim asserted by the Plaintiffs fails for lack of justifiable reliance.

In order to prevail on a constructive fraud theory, a plaintiff must first prove that a fiduciary relationship existed between the parties. *American Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 339 (Tex.App.--Houston [14th Dist.] 1991, no writ); *San Antonio Garment Finishers v. Levi Strauss & Co.*, 18 F. Supp. 669, 674 (W.D. Tex 1998). Having determined that no fiduciary relationship exists, Plaintiffs' constructive fraud claim must likewise fail.

As under the actual fraud theory, Plaintiffs' cause of action for negligent misrepresentation falls absent proof of reliance. To establish a cause of action for negligent misrepresentation, Plaintiffs must prove: (1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by *justifiably relying* on the representation. *Federal Land Bank Association of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (emphasis added). Although a fact question may exist as to the substance of DAI's representations during the oral conversations in 2001, there is no fact question regarding TSM's justifiable reliance on those conversations. The Agreement's requirements must control. Thus, Defendants are entitled to summary judgment on Plaintiffs' claim of negligent misrepresentation.

Plaintiffs final claim involves misrepresentations under the DTPA. Plaintiffs argue that Defendants violated the DTPA by "representing that an agreement confers or involves rights,

remedies, or obligations which it does not have or involve, or which are prohibited by law." *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(12) (Vernon 2002). As discussed in Part 2 supra, DAI and TSM did not enter into a new or modified agreement in 2001. This conclusion of law ultimately negates Plaintiffs' contention that "Joseph made . . . misrepresentations regarding the rights, qualities, security and benefits of their new agreement, and so did Wick."[13] Defendants are therefore entitled to summary judgment on this final claim as well.

## IV. Conclusion

No genuine issues of material fact remain on any of Plaintiffs claims for relief. The 1998 Agreement continued to govern the TSM/DAI relationship at all material times, and DAI properly terminated the relationship in accordance with the express provisions of the Agreement. Accordingly, it is hereby

**ORDERED** that Plaintiffs' motion to amend their complaint (Doc. 46) is **DENIED**; and

**ORDERED** that Defendants' motion for summary judgment (Doc. 47) is **GRANTED**.

SIGNED at Houston, Texas, this 31st day of January, 2007.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

[13] Plaintiff's Response at 19 (Doc. 58).